Filed 9/23/25  P. v. Molina CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HECTOR TREJO MOLINA,<br>Defendant and Appellant. | B335593<br><br>(Los Angeles County<br>Super. Ct. No. KA127040) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Victor D. Martinez, Judge.  Affirmed.

G. Martin Velez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran and Megan Moine, Deputy Attorneys General, for Plaintiff and Respondent

———————————————————

## INTRODUCTION

Defendant Hector Trejo Molina appeals from the judgment entered after she pled no contest to assault with a deadly weapon.[1]  On appeal, Molina contends the trial court abused its discretion by denying her motion for mental health diversion, arguing the evidence does not support the court's finding that she was unsuitable for diversion because she posed an unreasonable risk of danger to public safety.  We find no abuse of discretion and affirm.

## BACKGROUND

### 1.  The assaults

Our factual summary is taken from the preliminary hearing transcript.

On March 21, 2021, Molina threatened two passengers on a bus by holding a folding knife to their necks.  During the first incident, Molina was sitting at the back of the bus when Gonzalo Camacho boarded and sat in front of her.  Molina then placed a hand on Camacho's shoulder while holding a folding knife near his neck and yelled at him to "get out of the bus."  Camacho got off the bus, and Molina followed him.  Camacho then got back on the bus, and the driver closed the door.  When the driver later opened the door, Molina got back on the bus, and Camacho fled.  Camacho said that Molina "seemed . . . high."

During the second incident, Molina stood at the back of the bus and held a knife against the neck of Roberto Cuevas.  Police

---

[1]  When the trial court proceedings began, the court and parties referred to Molina using "he/him/his" pronouns.  From October 2023 on, the court and parties started referring to Molina using "she/her/hers" pronouns.  Throughout this opinion we too use "she/her/hers" pronouns when referring to Molina.

officers boarded the bus, pointed their guns at Molina, and told her to drop the knife.  One of the officers stated that Molina "may have" been high and that her knife "was creasing [Cuevas's] neck."  When the officer pointed his gun at Molina, she said "leave me alone."  The rear bus door opened, and Cuevas fled.

Molina continued to ignore police requests to drop her knife and departed the bus "holding [her] knife to [her own neck]," before running across a busy road.  When officers asked Molina to drop the knife, she told them to "leave [her] alone," and ran across the road.  She tried to stab herself with the knife but was not injured.  She eventually complied with police commands, dropped the knife, and was arrested.

## 2.     Trial court proceedings

On September 21, 2022, the People charged Molina with two counts of assault with a deadly weapon (Pen. Code,[2] § 245, subd. (a)) and one count of false imprisonment (§ 236).

On March 16, 2023, Molina filed a motion for mental health diversion under section 1001.36, outlining how she satisfied both the suitability and eligibility provisions of the statute.  She supported her motion with a report from Dr. Risa Grand, a forensic psychiatrist.  The report explained that Molina had a history of mental illness, including diagnoses for bipolar disorder, alcohol use disorder, and various substance abuse disorders.  Molina, who was 26 years old at the time she was interviewed by Dr. Grand, started drinking alcohol, smoking marijuana, and using "[h]eroin, PCP, mushroom[s], and molly" when she was 17 years old, and she struggled to remain sober ever since.

---

[2]     All further undesignated statutory references are to the Penal Code.

The report recounted Molina's memory of the crime. Although "imperfect," Molina recalled "being on the bus . . . because '[a] lot of rich people live [where it was going, and] rich people have drugs.' " "[V]oices told [her] that [she] would meet rich strangers there." Molina also recalled ' "being at gunpoint.' " Dr. Grand stated that Molina was using methamphetamine, fentanyl, and alcohol before and on the day of the crime. Additionally, Molina "was on [her] second or fifth day without sleep."

Dr. Grand concluded that Molina was "suitable for mental health diversion," stating that the current circumstances were "an excellent opportunity to offer [her] mental health diversion or at least consider mitigation." Dr. Grand stated that Molina "meets diagnostic criteria for Unspecified Schizophrenia Spectrum and Other Disorders [including Bipolar I Disorder, Manic with Psychotic Features, and various substance abuse disorders] . . . meaning [she] is psychotic and quite ill." Dr. Grand also reported that there was "a direct nexus between symptoms of [Molina's various disorders] . . . and the alleged offenses." She found that Molina's actions at the time of the offense were "clearly delusional and psychotic" and believed Molina's "Bipolar Disorder . . . and Substance Use Disorders [were] amenable to treatment."

Dr. Grand concluded that Molina would not be "overtly dangerous if [she] is supervised and sober . . . [and Dr. Grand does] not think [she was] at risk of a super strike if [she] is sober, supervised and on medications." However, Dr. Grand recommended treatment for Molina in a "locked or well-supervised program that is at least a year in length" that offers

"12-step programming, psychotropic medications, [and] psychoeducation."

On October 20, 2023, the trial court held a hearing on Molina's diversion motion. Molina's counsel reported that Molina was rejected from Olive Vista, the only secured facility that met "the court's prior concerns." Molina was instead accepted into a "highly supervised" program at L.A. CADA, a facility capable of supervising patients with a "dual diagnosis" like Molina.

The People urged the court to deny Molina's motion, asserting that she would be suitable for a diversion program only if she was "sober, supervised, and medicated." The People emphasized that Molina had not been sober since she was 17 years old, and she was noncompliant with her medication since her mental health diagnoses. The People asserted that Molina's history of substance abuse and unresolved mental health issues, coupled with the unprovoked manner in which she committed the charged assaults, showed that she would "do well to be in a locked supervised facility like [the unavailable] Olive Vista."

The trial court denied Molina's motion for diversion. The court found that while Molina met the eligibility requirements for diversion under section 1001.36, subdivision (b)(1)–(2), she was not suitable for diversion because she posed an unreasonable risk of danger to public safety and there were no available treatment facilities that could provide the level of security Molina needed for safe treatment within the community. Specifically, the court found that if she were treated in the community under pretrial mental health diversion, Molina would pose an unreasonable risk of committing a super strike, such as murder, attempted murder, or another homicide offense. Although the court assumed Molina

5

had no criminal history, it found that her actions "in this case [were] extremely violent," noting that the underlying incidents did not appear to be a "one-time thing" but rather an "example[] of somebody who is at an unreasonable risk of danger to public safety." The Court also noted that Molina needed a locked treatment facility, and the only suitable one could not treat her.

Following the denial of her motion for diversion, Molina pled no contest to one count of assault with a deadly weapon in violation of section 245, subdivision (a)(1). The trial court accepted the plea and sentenced Molina to two years in state prison. Molina was immediately released for time served.

On October 20, 2023, Molina filed a timely appeal. The trial court granted Molina's request for a certificate of probable cause to permit an appeal of its denial of her application for mental health diversion.

## DISCUSSION

In 2018, the Legislature enacted sections 1001.35 and 1001.36, creating a program of pretrial diversion intended for defendants with certain mental health disorders. (*People v. Frahs* (2022) 9 Cal. 5th 618, 624.) Diversion gives trial courts discretion to suspend criminal proceedings and can lead to potential dismissal of charges upon a defendant's successful completion of a mental health treatment program. (*Id.* at p. 626.) The mental health diversion statutes are to be applied as broadly as possible. (*Id.* at p. 632.)

The purpose of the mental health diversion program is to: (1) "increase[] diversion of individuals with mental disorders to mitigate . . . reentry into the criminal justice system while protecting public safety"; (2) allow "local discretion and flexibility for counties in the development and implementation of diversion

6

. . . across a continuum of care settings"; and (3) "provid[e] diversion that meets the . . . needs of individuals with mental health disorders." (§ 1001.35.)

In 2023, the Legislature amended section 1001.36, redefining the criteria set forth in subdivision (b)(1) and (b)(2) as "eligibility" requirements, and the criteria set forth in subdivision (c)(1) through (c)(4) as "suitability" requirements. (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 891 (*Sarmiento*).) A court may, in its discretion, grant pretrial diversion if the defendant satisfies the eligibility requirements under subdivision (b) and the court determines that the defendant is suitable for diversion under subdivision (c). (§ 1001.36, subd. (a).)

A defendant is eligible for diversion if: (1) "[t]he defendant has been diagnosed with a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders" and (2) "[t]he defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)–(2).) The court must assume that the defendant's mental disorder was a significant factor in the commission of the charged offense, "unless there is clear and convincing evidence that it was not a motivating factor, casual factor, or contributing factor to the defendant's involvement in the alleged offense." (*Id.*, subd. (b)(2).)

If a "defendant satisfies the eligibility requirements . . . in subdivision (b)," the court then must determine "whether the defendant is suitable for pretrial diversion." (§ 1001.36, subds. (a) & (c).) A defendant is suitable for pretrial diversion if: (1) according to a "qualified mental health expert," the "defendant's . . . mental disorder causing, contributing to, or

7

motivating the criminal behavior would respond to mental health treatment"; (2) "[t]he defendant consents to diversion and waives [the] right to a speedy trial"; (3) "[t]he defendant agrees to comply with treatment as a condition of diversion"; and (4) "[t]he defendant will not pose an unreasonable risk of danger to public safety . . . if treated in the community." (*Id.*, subd. (c)(1)–(4).)

The trial court retains "residual" discretion to deny diversion even where the defendant makes a prima facie showing that he or she meets all the statutory requirements. (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 892.) This discretion must be exercised " ' "consistent with the principles and purpose of the governing law." ' " (*Ibid*.) "That purpose includes a strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community. Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals." (*Id.* at pp. 892–893.)

We review a trial court's denial of a motion for mental health diversion for abuse of discretion. (*People v. Moine* (2021) 62 Cal.App.5th 440, 448 (*Moine*).) An abuse of discretion occurs when a court "makes an arbitrary or capricious decision by either applying the wrong legal standard" or "bas[ing] its decision on . . . factual findings . . . not supported by substantial evidence." (*Id.* at p. 449.)

The court found that Molina met the eligibility requirements for pretrial diversion. Dr. Grand reported that Molina was diagnosed with various mental health and substance abuse disorders, and that those disorders played a significant role

8

in the commission of the charged offenses.  (See § 1001.36, subd. (b)(1)–(2).)  The only issue on appeal is whether the court abused its discretion in finding Molina was not suitable for diversion because she posed an unreasonable risk of danger to public safety if treated in the community.  (See *id.*, subd. (c)(4).)

"[U]nreasonable risk of danger to public safety" is defined by section 1170.18 subdivision (c), and it requires the court to find that the defendant is likely to commit a super strike as defined by section 667, subdivision (e)(2)(C)(iv).  (§§ 1001.36, subd. (c)(4); 1170.18, subd. (c); see also *Moine*, *supra*, 62 Cal.App.5th at p. 450.)  Section 667 lists a series of qualifying super strikes, including "any homicide offense . . . [and] any attempted homicide offense."  (See § 667, subd. (e)(2)(C)(iv)(IV).)

In determining whether a defendant poses an unreasonable risk of danger to public safety if treated within the community, the "court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate."  (§ 1001.36, subd. (c)(4).)  As we explain, the court did not abuse its discretion when it found Molina posed an unreasonable risk of danger to public safety if she were treated in the community.

While Molina's charged offenses—assault with a deadly weapon and false imprisonment—do not qualify as super strikes (see § 667, subd. (e)(2)(C)(iv)), the trial court found that Molina's conduct—holding a knife to the victims' necks—was "extremely violent."  Indeed, such conduct could have resulted in serious injury, or even death, to either of the victims.  Based on the circumstances of the charged offenses, the court reasonably could

9

find that Molina posed an unreasonable risk of committing a super strike—i.e., a homicide or attempted homicide offense—if treated in the community.  (See *People v. Bunas* (2022) 79 Cal.App.5th 840, 861–862 [the trial court may rely solely on the circumstances of the underlying offense in determining a defendant's suitability for diversion].)

Molina's long history of unresolved mental health and substance abuse issues, coupled with the unavailability of a suitable secure treatment facility, also support the court's finding that she posed an unreasonable risk of danger to public safety if treated within the community.  According to Dr. Grand, Molina would not pose a risk of committing a super strike if she remained "sober, supervised and on medications."  Molina, however, had been abusing drugs and alcohol for nearly a decade before the underlying assaults.  During that time, Molina never participated in a formal drug treatment program, nor did she have any considerable periods of sobriety.  Dr. Grand also reported that Molina did not seek treatment for her mental health disorders, even though she was "identified with ADHD and Bipolar Disorder as an adolescent and child," and she was noncompliant with her psychotropic medications.  Based on this record, it was reasonable for the court to find that Molina could not safely be treated in the community unless she were admitted to a secure facility.  Because the only secure facility that could meet Molina's treatment needs rejected her, the court did not abuse its discretion in denying Molina's request for diversion.

Relying on *Moine*, Molina argues it was "logically inconsistent" for the court to find she posed an unreasonable risk of danger to public safety if treated in the community while later releasing her on time served after she entered her no contest

plea.  The defendant in *Moine*, who had no history of committing violent crimes, fought another patient at an urgent care facility. (*Moine*, *supra*, 62 Cal.App.5th at p. 444.)  A year later, the defendant threatened to shoot an urgent care worker, but he immediately and profusely apologized for making the threat.  (*Id*. at pp. 444–445.)  The defendant was later charged with several counts of assault and criminal threats.  (*Id*. at p. 444.)  The court released the defendant on bond for two years, finding he was not likely to cause great bodily harm to others if released into the community.  (*Id*. at p. 451.)

Before trial, the defendant requested pretrial mental health diversion, and he submitted a report in which two psychiatrists concluded that he posed a low risk for future assault.  (*Moine*, *supra*, 62 Cal.App.5th at pp. 446–447.)  The court denied the defendant's request, finding he posed an unreasonable risk of danger to public safety if treated within the community.  (*Id*. at p. 447.)  The Court of Appeal reversed the trial court's order denying diversion, explaining that it was "logically inconsistent to deny mental health diversion on the ground that [the defendant] was likely to commit a super-strike offense, while simultaneously finding he was not likely to inflict great bodily injury on persons in the community."  (*Id*. at p. 451.)

*Moine* is distinguishable.  Here, Molina remained in custody from the time of her arrest for the underlying charges through the proceedings on her request for mental health diversion.  In addition, unlike the trial court in *Moine*, the trial court in this case never found that Molina was not likely to harm others if released into the community, nor did it otherwise make any finding that contradicts its determination that Molina posed an unreasonable risk of danger to public safety if treated in the

11

community.  Further, to the extent it may appear inconsistent to deny a defendant's request for pretrial mental health diversion while simultaneously allowing her to enter a plea that results in her immediate release for time served, that is not the test for error under the diversion statute.  The trial court here was tasked with determining whether Molina was both eligible *and* suitable for diversion.  (§ 1001.36, subd. (a).)  The court evaluated both prongs and determined that Molina was not suitable for diversion because she posed an unreasonable risk of danger to public safety if treated in the community.  As we explained above, that finding was supported by the record.  The court, therefore, did not abuse its discretion when it denied Molina's request for diversion.

## DISPOSITION

The judgment is affirmed.

VIRAMONTES, J.

WE CONCUR:

WILEY, Acting P. J.

RUBIN, J.*

---

* Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12